UNITED SCAFFOLDING,
INC., Petitioner,

v.

James LEVINE, Respondent

No. 15-0921

Supreme Court of Texas.

Argued March 2, 2017

OPINION DELIVERED: June 30, 2017

Rehearing Denied January 26, 2018

Corrected January 26, 2018

464

Roger W. Hughes, Adams & Graham, L.L.P., Harlingen, for Amicus Curiae Texas Association of Defense Counsel.

David M. Gunn, Erin H. Huber, Beck Redden LLP, Houston, Kathleen Marie Kennedy, Beaumont, for Petitioner.

Christopher Michael Portner, J. Trenton Bond, Portner& Bond PLLC, Beaumont, for Respondent.

Justice Green delivered the opinion of the Court, in which Chief Justice Hecht, Justice Johnson, Justice Willett, Justice Guzman, and Justice Brown joined.

In this slip-and-fall case, we are presented with two challenges to a trial court judgment rendered against a scaffolding contractor. First, the contractor challenges the jury submission of the plaintiff's claim under a general-negligence theory of recovery, arguing that the plaintiff brought a claim for premises liability, which necessarily fails because the plaintiff did not request and obtain findings on the elements of that claim. We hold that the plaintiff's claim against the contractor sounds in premises liability, and a general-negligence submission cannot support the plaintiff's recovery in a premises liability case. Second, the contractor challenges the trial court's order granting a new trial, arguing that the new trial order can be reviewed by direct appeal after final judgment was rendered in the subsequent trial. While the contractor presents an interesting issue, we do not reach it because our ruling on the submission issue is dispositive in the contractor's favor. We reverse the court of appeals' judgment and render a take-nothing judgment.

## I. Background and Procedural History

On December 26, 2005, James Levine, a pipefitter for Valero Energy Corporation and an employee at Valero's Port Arthur refinery, was scheduled to work an overtime shift in the refinery's alkylation unit. Because it was an overtime shift, Levine did not work with his usual crew, but each member of the overtime crew was a Valero employee. The overtime crew was tasked with routine maintenance that required the installation of two blanks into an exchanger, a dangerous job that placed Levine and other crew members more than fifteen feet above the ground on a scaffold, where they donned protective clothing and were supplied "fresh air" through special equipment that was constantly monitored by a crew member. Levine alleges that he slipped on a piece of plywood that had not been nailed down, causing him to fall up to his arms through a hole in the scaffold. Levine alleges that he suffered a neck injury as a result of the fall.

The scaffold on which Levine allegedly fell was constructed by United Scaffolding, Inc. (USI), a contractor Valero hired to build scaffolds at its Port Arthur refinery. According to both USI's and Valero's scaffold policies, and in compliance with Occupational Safety and Health Administration (OSHA) regulations, USI was required to inspect the nearly three thousand scaffolds at the refinery before each work shift and before each scaffold's use. It is undisputed that USI assembled the scaffold at issue approximately one week before the maintenance work commenced, and it is undisputed that USI representatives were not present on the date of, and at least three days preceding, Levine's fall.

Levine filed suit against USI, claiming that USI improperly constructed the scaffold and failed to remedy or warn of the dangerous condition on the scaffold, causing his injury. The case was tried before a jury for the first time in December 2008. The trial court submitted a general-negligence question to the jury, offered by USI, and the jury returned a verdict finding USI negligent. The jury apportioned responsibility among the parties, assigning 51% to USI and 49% to Levine. The jury awarded Levine $178,000 in damages for future medical expenses, but it declined to award any damages for past medical expenses, past or future pain and suffering, mental anguish, or loss of earning capacity.

Levine filed a motion for new trial, asserting that the jury's verdict was against the great weight and preponderance of the evidence. The trial court agreed and granted a new trial "in the interest of justice and fairness." *In re United Scaffolding, Inc.*, 301 S.W.3d 661, 662 (Tex. 2010) (per curiam) (orig. proceeding). Asserting that the trial court abused its discretion by ordering the new trial, USI filed a petition for writ of mandamus in the Ninth Court of Appeals, which denied relief. *In re United Scaffolding, Inc.*, 287 S.W.3d 274, 275 (Tex. App.—Beaumont 2009, orig. proceeding), *mand. granted*, 301 S.W.3d at 663. USI then filed a petition for writ of mandamus in this Court, and we conditionally granted the writ, directing the trial court to "specify its reasons for disregarding the jury verdict and ordering a new trial." *In re United Scaffolding*, 301 S.W.3d at 663. The trial court subsequently amended its order, but USI again sought mandamus relief, which the court of appeals again denied. *In re United Scaffolding, Inc.*, 315 S.W.3d 246, 251 (Tex. App.—Beaumont 2010, orig. proceeding), *mand. granted*, 377 S.W.3d 685, 690 (Tex. 2012). USI then filed a second petition for writ of mandamus in this Court, alleging that the trial court did not fully comply with our instruction from the first mandamus proceeding. *In re United Scaffolding, Inc.*, 377 S.W.3d at 686–87. We conditionally granted the writ and directed the trial court to "resolve all ambiguity" by amending the new trial order to include "only the specific and valid reasons that, in the context of this case, ... it granted a new trial." *Id.* at 690. The trial court amended its order, and USI did not file a third petition for writ of mandamus.

The case was tried for a second time in February 2014. Just as it did in the first trial, the trial court submitted a general-negligence question to the jury, and USI neither offered a premises liability question nor objected to the general-negligence question. At the conclusion of the second trial, Levine faired much better. In addition to allocating 100% of the responsibility to USI, the jury awarded Levine nearly $2 million in past and future damages. USI filed a motion for new trial and a motion for judgment notwithstanding the verdict. In its motion for judgment notwithstanding the verdict, USI raised the argument, for the first time, that the trial court improperly submitted a general-negligence question to the jury when Levine's claim sounded in premises liability. Levine cited our decision in *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523 (Tex. 1997), asserting that submission of the improper theory of recovery required the trial court to render a take-nothing judgment. The trial court denied both motions and entered judgment in Levine's favor.

USI raised two issues on appeal: (1) whether Levine's claim was improperly submitted under a general-negligence theory of recovery; and (2) whether the new trial order following the first trial was improperly granted. The court of appeals affirmed the trial court's judgment. 520 S.W.3d 631, 632, 2015 WL 5157837 (Tex.

App.—Corpus Christi–Edinburg 2015, pet. granted). As to the first issue, the court of appeals concluded that the relevant inquiry for determining the proper characterization of Levine's claim hinged on whether USI controlled the premises, which the court held that USI did not. *Id.* at 635–36, 2015 WL 5157837. Declining to reach the second issue, the court of appeals held that although several of our recent decisions could be characterized as expanding the scope of appellate review of new trial orders via mandamus, those holdings do not permit the direct appeal of a new trial order following the completion of the new trial. *Id.* at 636, 2015 WL 5157837.

## II. Character and Submission of Levine's Claim

In its first issue, USI contends that it is entitled to a take-nothing judgment because Levine's premises liability claim was improperly submitted to the jury under a general-negligence theory of recovery. Levine argues that his claim was properly submitted and, even if his claim sounded in premises liability, USI waived its argument either by not objecting to the jury charge or by inviting the error when it requested a general-negligence question in the first trial. As we explain below, both Levine's trial court petition and the evidence presented at trial compel the conclusion that Levine's claim is premised on USI's having the right to control the scaffold at the time Levine allegedly suffered injury. We hold that Levine's claim sounds in premises liability, and, as a result, the general-negligence findings cannot support Levine's recovery. Additionally, we hold that USI neither waived its submission argument nor invited error and that USI properly preserved error by raising its argument in its motion for judgment notwithstanding the verdict.

### A. Standard of Review

A trial court must submit jury questions, instructions, and definitions that "are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278; *see also Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999). In reviewing alleged error in a jury submission, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (citing *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 843 (Tex. 2005); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)). The alleged charge error "will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *Island Recreational*, 710 S.W.2d at 555; *see also Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995).

Whether the condition that allegedly caused the plaintiff's injury is a premises defect is a legal question, which we review de novo. *See Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 385 (Tex. 2016); *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007); *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 866 (Tex. 2002) (per curiam); *State v. Burris*, 877 S.W.2d 298, 299 (Tex. 1994) (per curiam); *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 238 (Tex. 1992). As we have held for two decades, a premises defect case improperly submitted to the jury under only a general-negligence question, without the elements of premises liability as instructions or definitions, causes the rendition of an

improper judgment.[1] *Olivo*, 952 S.W.2d at 529.

## B. Character of Levine's Claim

■ "A general contractor in control of the premises may be liable for two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *Id.* at 527 (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985)). Levine argues on appeal that neither of those types of negligence applies in this case because USI relinquished control of the scaffold before Levine was injured, leaving Levine with a general-negligence claim. The court of appeals considered USI's control over the premises to be the central inquiry in determining the character of Levine's claim. 520 S.W.3d at 635–36, 2015 WL 5157837. Concluding that Valero controlled the scaffold on the day of Levine's accident, the court of appeals held that Levine's claim was properly submitted under a general-negligence theory of recovery. *Id.* at 635, 2015 WL 5157837. In reviewing the alleged charge error, we must consider the nature and circum-

---

1. The dissent suggests that we apply the improper standard of review because we do not review the legal question of the character of Levine's claim under some sort of sufficiency-of-the-evidence standard. 537 S.W.3d at 634, (Boyd, J., dissenting). *But see Reliance Nat'l*, 227 S.W.3d at 50 ("Appellate courts review legal determinations de novo, whereas factual determinations receive more deferential review based on the sufficiency of the evidence."). Disregarding controlling law and relying on inapplicable cases, the dissent argues that because USI did not specifically challenge the validity of Levine's general-negligence legal theory, we must affirm the trial court's judgment unless USI conclusively established that there is "no evidence" to support the general-negligence submission. *Id.* at 635–36. The dissent ignores this inconsistency and instead misstates our holding in *Olivo* in an effort to avoid its clear application to our review in this case. *Id.* at 634. The dissent claims that our standard of review would be appropriate only if a premises liability instruction had been given. *Id.* at 634, 2015 WL 5157837. But that ignores *Olivo*, in which the jury was given no premises liability instructions or definitions, and we considered whether the pleadings and evidence supported the plaintiff's recovery. *See Olivo*, 952 S.W.2d at 529. Although the jury in *Olivo* found liability under a general-negligence theory, our analysis did not consider whether "any allegations and evidence support" general negligence, as the dissent would have us do here. 537 S.W.3d at 486; *Olivo*, 952 S.W.2d at 528–29. Instead, we considered the character of the plaintiff's claim by first determining the source of the plaintiff's alleged injury—premises defect—and then determining the duties owed, concluding that the general contractor defendant owed the plaintiff premises duties if it retained a right to control the work that created the dangerous condition. *Olivo*, 952 S.W.2d at 528–29. Recognizing that "premises defect cases and negligent activity cases are based on independent theories of recovery" and that "[w]e have explicitly required that the trial court submit the *Corbin* elements in a premises defect case," we held that "[b]ecause the Olivos did not obtain a jury finding that included essential elements of their premises defect claim, they cannot recover." *Id.* at 529 (citing Tex. R. Civ. P. 279). Although the case before us today involves the question of control over the *premises* rather than control over defect-producing work, *Olivo* guides our review of the alleged charge error. We reject the dissent's veiled and disjointed effort to overrule *Olivo* by suggesting that a premises liability claim submitted as a general-negligence question without instructions as to traditional premises liability elements is proper so long as any allegation and evidence can be found in the record to support a general-negligence claim. As premises liability is a "branch of negligence law," *Occidental Chemical Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016), the dissent's new rule would effectively eliminate premises liability submissions altogether. Finally, we reject the dissent's implication that premises liability is simply an affirmative defense, requiring the defendant to bear the burden of ensuring submission of the proper theory of recovery to support a premises liability judgment in the plaintiff's favor. *See infra*, Part III.

stances of Levine's injury, Levine's allegations against USI, and the evidence presented at trial.

## 1. Theories of Recovery

██ [A] person injured on another's property may have either a negligence claim or a premises-liability claim against the property owner. When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. When the injury is the result of the property's condition rather than an activity, premises-liability principles apply. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016) (citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992)). Negligence and premises liability claims thus are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775–76 (Tex. 2010); *Keetch*, 845 S.W.2d at 264. Because negligence and premises liability claims are based on independent theories of recovery, we have held that they are not interchangeable. *See Occidental*, 478 S.W.3d at 644 (noting that premises liability "is itself a branch of negligence law" with different elements defining a property owner or occupier's duty of care); *Olivo*, 952 S.W.2d at 529.

██ Negligent-activity and premises liability claims "involve closely related but distinct duty analyses." *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). In a negligent-activity case, a property owner or occupier must "do what a person of ordinary prudence in the same or similar circumstances would have . . . done," whereas a property owner or occupier in a premises liability case must "use ordinary

care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (alteration in original) (citations and internal quotation marks omitted); *see also TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex. 2009) ("[A] premises owner or occupier must either adequately warn of the dangerous condition or make the condition reasonably safe."). Underpinning the distinctions between these claims is the principle that "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Del Lago*, 307 S.W.3d at 776 (footnotes omitted). Generally, a plaintiff need only submit a general-negligence question in support of its claim for a defendant's liability under a negligent-activity theory. *State v. San Miguel*, 981 S.W.2d 342, 347–48 (Tex. App.—Houston [14th Dist.] 1998) (citing *Keetch*, 845 S.W.2d at 264), *rev'd on other grounds sub nom. State v. Miguel*, 2 S.W.3d 249 (Tex. 1999). For a premises liability defendant to be liable for a plaintiff's injury, however, we held in *Corbin v. Safeway Stores, Inc.*, that a plaintiff must prove:

(1) that [the defendant] had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm to [the plaintiff]; (3) that [the defendant] did not exercise reasonable care to reduce or to eliminate the risk; and (4) that [the defendant's] failure to use such care proximately caused [the plaintiff's] personal injuries.

648 S.W.2d 292, 296 (Tex. 1983). Consequently, when submitting a premises liability cause of action to a jury, "a simple negligence question, unaccompanied by the *Corbin* elements as instructions or definitions, cannot support a recovery in a premises defect case." *Olivo*, 952 S.W.2d at 529 (citing *Keetch*, 845 S.W.2d at 266–67; *Warner*, 845 S.W.2d at 259–60).

### 2. The Source of Levine's Injury

Understanding the general principles that distinguish negligent-activity from premises liability claims, we next turn to whether Levine's alleged injury resulted from a contemporaneous negligent activity or a condition on the property. *See Sampson*, 500 S.W.3d at 388 ("When distinguishing between a negligent activity and a premises defect, this Court has focused on whether the injury occurred by or as a contemporaneous result of the activity itself—a negligent activity—or rather by a condition created by the activity—a premises defect." (citing *Keetch*, 845 S.W.2d at 264)). "A condition poses an unreasonable risk of harm for premises-defect purposes when there is a 'sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen.'" *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (quoting *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754 (Tex. 1970)). We have recognized that "slip/trip-and-fall cases have consistently been treated as premises defect causes of action." *Sampson*, 500 S.W.3d at 391. In such cases, the plaintiff alleges injury as a result of a physical condition or defect left on the premises, "not as a contemporaneous result of someone's negligence." *Olivo*, 952 S.W.2d at 527 (citing *Keetch*, 845 S.W.2d at 264; *Warner*, 845 S.W.2d at 259); *see Sampson*, 500 S.W.3d at 390–91. Although we have acknowledged that at some point, almost every "artificial condition upon which a premises liability claim is based may be created by an activity," we have declined to completely eliminate the distinction between premises conditions and negligent activities. *See Sampson*, 500 S.W.3d at 388; *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *Keetch*, 845 S.W.2d at 264. We again decline to do so here.

In this case, Levine alleged that he was injured when he fell through a hole in the USI-constructed scaffold after a piece of plywood that was not nailed down slipped from under him. Levine has never alleged that any sort of contemporaneous, ongoing activity caused his injury. Rather, in his trial court petition, Levine alleged that USI created a dangerous condition by "improperly assembling, erecting, and/or securing the scaffolding." Levine further alleged, among other things, that USI failed to "adequately determine dangerous conditions created," "correct the dangerous condition which existed with the scaffolding," "secure the scaffolding in a proper and safe work condition," and warn "that a dangerous condition existed which required extra care to be taken" by Levine while working on the scaffold. In essence, Levine claims that his injury resulted from a physical condition USI created and then left on the premises. We have repeatedly characterized such slip-and-fall claims as premises defect cases because the injuries were alleged to have resulted from physical conditions on property. *E.g.*, *Olivo*, 952 S.W.2d at 526–27 (holding that a slip-and-fall plaintiff who alleged injury resulting from drill pipe thread protectors that had been left on the ground, and not as a contemporaneous result of someone's negligence, had brought a premises defect case); *Keetch*, 845 S.W.2d at 264 (holding that although a slip-and-fall plaintiff alleged injury as a result of grocery store

plant spraying, no ongoing activity was occurring when the plaintiff was injured and the claim was properly submitted as premises liability); *Warner*, 845 S.W.2d at 259 (holding that a slip-and-fall plaintiff alleged only a premises liability claim where "it [was] undisputed that she was injured by a condition of the premises—a puddle of water, chicken blood, and other fluids that had accumulated on the floor—rather than a negligently conducted activity"). We see no reason to depart from that conclusion here, where the only fair reading of Levine's allegations is that his injury resulted from a physical condition left on the property—a hole in the scaffold platform, covered by an unsecured sheet of plywood—and not some contemporaneous activity. Therefore, on the question of whether Levine's claim arises from a contemporaneous negligent activity or a condition on the property, we hold that Levine's alleged injury arose from a premises defect.

We next consider the court of appeals' conclusion that Levine's claim was nevertheless properly submitted under a general-negligence theory of recovery because "USI did not have a level of control sufficient to establish a premises defect claim." 520 S.W.3d at 636, 2015 WL 5157837.

### 3. USI's Duty to Levine

■■ We begin with the question of whether any duty of care USI owed Levine as to the scaffold condition is derived from our premises defect body of law, as USI contends. Levine argues on appeal that no premises liability claim exists because USI, a contractor, did not own, physically possess, or control the premises and therefore owed Levine no duty under a premises liability theory; rather, USI was hired to assemble the scaffold and did so negligently, making this purely a negligence case. Whether a duty exists is a question of law for the court, and the presence of an unreasonably dangerous condition weighs in favor of recognizing a duty. *Allen Keller Co. v. Foreman*, 343 S.W.3d 420, 425 (Tex. 2011) (citing *Del Lago*, 307 S.W.3d at 767); *cf. Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex. 1991) ("[I]n some instances [a court] may require the resolution of disputed facts or inferences which are inappropriate for legal resolution." (citing *Mitchell v. Mo.-Kan.-Tex. R.R. Co.*, 786 S.W.2d 659, 662 (Tex.), *cert denied*, 498 U.S. 896, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990))). We begin with a discussion of the premises duties an owner or occupier of land owes and when a contractor might assume those same duties.

### a. Status of Parties

■■ Generally, an owner or occupier of property has a duty to keep the premises under its control in a safe condition. *Redinger*, 689 S.W.2d at 417 (citing *Smith v. Henger*, 148 Tex. 456, 226 S.W.2d 425 (1950)). However, an owner or occupier "is not an insurer of [a] visitor's safety." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015) (alteration in original) (quoting *Del Lago*, 307 S.W.3d at 769). "[A] premises-liability defendant may be held liable for a dangerous condition on the property if it assumed control over and responsibility for the premises, even if it did not own or physically occupy the property." *Cty. of Cameron*, 80 S.W.3d at 556 (internal quotations and alterations omitted) (citing *Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999) (per curiam); *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986)). Moreover, a premises liability defendant may be subject to liability if it has a right to control the premises, which "may be expressed by contract or implied by conduct." *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008) (citations omitted). Accordingly,

physical possession does not equate to the right to control the premises; one can exist without the other. *See Butcher v. Scott*, 906 S.W.2d 14, 15–16 (Tex. 1995) (per curiam).

An owner or occupier generally does not have a duty to ensure that a general contractor performs work in a safe manner. *Redinger*, 689 S.W.2d at 418. Essentially, a general contractor that assumes control of or retains the right to control the premises "is charged with the same duty as an owner or occupier." *Olivo*, 952 S.W.2d at 527 (citing *Redinger*, 689 S.W.2d at 417). Thus, the duty to make the premises safe or warn of dangerous conditions "generally runs with the ownership or control of the property," and a defendant's liability under a premises liability theory rests on the defendant's assumption of control of the premises and responsibility for dangerous conditions on it. *Occidental*, 478 S.W.3d at 644; *see Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 265 (Tex. 2014) (per curiam) (noting that a premises liability plaintiff must prove the defendant's ownership or control).

In premises liability cases, we have held that "the duty owed to the plaintiff depends upon the status of the plaintiff at the time the incident occurred." *Urena*, 162 S.W.3d at 550 (citing *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 675 (Tex. 2004); *Corbin*, 648 S.W.2d at 295–96). After all, premises liability is a form of negligence, and "[i]n all negligence actions, the foreseeability of the harmful consequences resulting from the particular conduct is the underlying basis for liability." *Corbin*, 648 S.W.2d at 296. Here, no party disputes that Levine, a Valero pipefitter using a USI-constructed scaffold at the Valero plant, is an invitee. *See Austin*, 465 S.W.3d at 202 ("An invitee is one who enters the property of another with the owner's knowledge and for the mutual benefit of both. Employees working at their employ-

ers' premises fit this description...." (internal quotations and citations omitted)). Therefore, the duty owed to Levine as an invitee would be "to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Id.* at 203 (citations omitted); *see Olivo*, 952 S.W.2d at 527. This duty is imposed on owners, occupiers, or persons in control of the premises because they are "typically in a better position than the invitee to be aware of hidden hazards on the premises." *Austin*, 465 S.W.3d at 203.

Neither party disputes that USI, a third-party company Valero hired to install, inspect, modify, and dismantle scaffolding at its Port Arthur Refinery, is a general contractor. As a general contractor, USI thus may be subject to liability for breaching any duties that a property owner would owe to business invitees. *Redinger*, 689 S.W.2d at 417. In evaluating whether a general contractor owes an invitee a duty of care as to the property condition, the "relevant inquiry is whether the [contractor] assumed sufficient control over the part of the premises that presented the alleged danger so that the [contractor] had the responsibility to remedy it." *Cty. of Cameron*, 80 S.W.3d at 556. Thus, whether USI owed Levine a premises duty must be determined by examining whether USI maintained a right to control the scaffold that allegedly caused Levine's injury. *See id.*; *Moritz*, 257 S.W.3d at 214.

#### b. Control

We next review Levine's pleadings and the evidence presented at trial to determine whether Levine's claim relies on USI's right to control the scaffold or on USI's having relinquished control of the scaffold.

Levine's trial court petition asserts allegations inconsistent with the position he now takes on appeal—that USI lacked control of the premises at the time of his injury. In his petition, Levine alleged that he was injured "while working on a scaffolding which had been erected/constructed/supervised /built by [USI]" and that USI "had direction, control and supervision over the erection/building of the scaffolding." In addition to alleging that USI created and then failed to remedy, or warn about, a dangerous condition on the scaffold, Levine's pleadings further allege USI's responsibility for the scaffold by claiming that USI failed to provide him and others "sufficient training and instruction ... on the proper erection and use of the scaffolding," failed "to adequately inspect the scaffolding," failed "to maintain the scaffolding in a proper and safe work condition," failed "to provide ... a safe working environment," failed "to enforce proper safety codes, rules, standards and practices," failed "to instruct," failed "to properly supervise," and failed "to ensure the safety of the workers attempting to use the scaffolding." Under each of these nonfeasance allegations, USI could not be liable unless it had the right to control the scaffold.

Levine does not explain how, absent control, USI could have the duty to train, instruct, inspect, supervise, maintain, or ensure the safety of workers charged with using the USI-constructed scaffold. Instead, Levine now argues that USI's trial

defense—that USI was not present on the Valero work site at the time of Levine's accident and that Valero did not notify USI of its intent to use the scaffold, which would have triggered USI's inspection of the scaffold to ensure its safety before the shift began—constitutes an admission by USI that it did not control the scaffold. But USI's argument does not create a dispute over Levine's assertion of USI's control; in fact, USI argues quite clearly that it controlled and was responsible for the scaffold.[2] Levine confuses USI's presence at the work site, or occupancy, with control over the scaffold. The relevant inquiry in this instance is not whether USI's employees were present at the work site, which is not in dispute, but whether USI retained a sufficient right of control over the work site's scaffold such that it had the responsibility to remedy the condition that Levine alleges caused his injury. *See Cty. of Cameron*, 80 S.W.3d at 556. The only fair reading of Levine's pleadings requires the determination that Levine did in fact allege that USI assumed and retained the right to control the scaffolding it constructed, giving rise to a duty to make and keep the premises safe for business invitees, and that USI allegedly breached its duty to warn of the dangerous condition on the scaffold or make it safe, proximately causing Levine's injury.

The evidence presented at trial is consistent with our reading of Levine's pleadings. The scaffold erected in the alkylation

---

**2.** We note that Levine alleges inconsistency between USI's argument on appeal—that USI retained control over the scaffold that allegedly resulted in Levine's injury—and USI's argument at trial—that USI was not responsible for Levine's injury that allegedly resulted from the scaffold's condition. As an example, Levine points to testimony from USI Site Safety Coordinator, Kenneth Broussard, who testified that if Valero inspected the scaffold, then Valero assumed responsibility for the

scaffold. That testimony does not indicate that USI lacked control. Rather, it simply represents one lay witness's opinion that responsibility for the scaffold belonged to whichever party conducted the inspection. Ultimately, however, USI's trial argument that Valero did not notify USI of its intent to use the scaffold prior to Levine's accident, thus relieving USI of liability, speaks to the element of breach, not duty.

unit was built by USI nearly a week before Valero's intended use. It was assembled solely for the job assigned to the overtime crew, and it was just one of many scaffolds constructed pursuant to the ongoing contractual relationship between USI and Valero, which resulted in the daily use of approximately 3,000 USI-constructed scaffolds at the Port Arthur refinery (at a rate of an estimated sixty to eighty USI-constructed scaffolds erected daily). Although the contract between USI and Valero is not included in the record, documents presented and testimony elicited at trial demonstrate that USI and Valero maintained separate scaffold policies, each intended to conform with federal law and OSHA regulations. The USI and Valero policies mandate strict adherence to a scaffold tagging procedure that requires an OSHA "competent person" to inspect each scaffold before each work shift and before each use.[3] According to Valero, the purpose of the tagging procedure is to "ensure that all scaffolds being erected and all work performed from scaffolds is being done in a safe and uniform manner." Although USI

maintains its own tagging system, its policy is to conform to its clients' procedure so long as that policy does not violate OSHA regulations.

Under Valero's scaffolds policy, located within its General Guidelines for Contractor Safety, Valero mandates that, among other things, "CONTRACTORS shall ensure that all *users* of scaffolds have been trained in the proper use of and the hazards associated with scaffolds prior to allowing employee access to any scaffold." Additionally, the policy mandates that "CONTRACTORS shall ensure each scaffold is inspected prior to each work shift before allowing AFFECTED EMPLOYEES to begin work." Finally, "CONTRACTORS shall only allow employee access to scaffolds that are properly constructed, inspected, and tagged." Thus, Valero places upon USI, Valero's "CONTRACTOR," sole authority to authorize Valero employees to use scaffolds USI has constructed.[4] Trial testimony from Valero and USI employees establishes that, on the date of Levine's alleged injury, these policies were in place

---

**3.** OSHA defines a "competent person" as "one who is capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.450(b) (2016).

**4.** The dissent correctly references trial testimony that Valero had "competent persons" on site who could inspect scaffolds, but the dissent makes an inferential leap when it suggests that this testimony proves USI lacked control. 537 S.W.3d at 496. The dissent simply ignores the Valero policy that grants USI the sole authority to give Valero employees access to scaffolds that USI has constructed. The fact that Valero may have employed "competent persons" qualified to inspect scaffolding does not mean that anyone other than USI ever did inspect scaffolding. The only evidence that *anyone* inspected the scaffold upon which Levine allegedly suffered injury

on the date of the accident was Levine's own testimony—the same testimony in which Levine confirmed that without an updated inspection, he should not have worked on the scaffold. Even if someone other than a USI "competent person" inspected the scaffold, the record evidence indicates that this inspection would have violated Valero's policy. We cannot interpret the trial testimony to mean anything more than what OSHA says—only a "competent person" "is capable of" inspecting scaffolds. *See* 29 C.F.R. § 1926.450(b). The record evidence establishes that Valero hired USI to build and inspect scaffolding, and the scaffold policies combined with the trial testimony support that USI did just that. It could be true that, on the day of the accident, some mystery, OSHA-qualified Valero "competent person" secretly inspected the scaffold and updated the tag that Levine claims authorized his use of the scaffold, but even that would not negate USI's subsequent right to control the scaffold.

and observed by both Valero and USI. Tony Lawrence, Valero's maintenance supervisor who supervised the overtime crew on the day of Levine's accident, confirmed that he or someone else in the maintenance department would have contacted USI to communicate the need for USI to construct a scaffold for the overtime crew to perform its work in the alkylation unit. Lawrence's testimony confirmed that the scaffold was constructed by USI and remained unused for nearly a week before the overtime crew began its work. Lawrence also testified that although Valero employed carpenters that were qualified as competent persons under OSHA regulations, they were not contacted or used to inspect the scaffold upon which Levine allegedly suffered injury. Although Lawrence was unsure as to whether Valero and OSHA required scaffold inspections before each use at the time of Levine's alleged injury, he testified that such a rule would have required USI to inspect the scaffold before its use by the overtime crew. Additionally, he testified that USI was not contacted because its representatives were not present at the work site. Lawrence testified that Valero's typical practice was to use some form of electronic communication to notify USI on a daily basis as to which scaffolds would be used and where new scaffolds needed to be constructed. Indeed, Valero would even contact USI the day before scheduled work that would require use of a particular scaffold so that USI could inspect the scaffold and update the scaffold's tag. Lawrence testified that this process was in place to allow USI to ensure the scaffold's safety and confirm that no one else had altered the scaffold post-construction. Further, and in line with Valero's scaffolds policy, Lawrence testified that Valero would contact USI to have them dismantle the scaffold once the necessary work was complete.

The dissent confuses the issue by suggesting that Valero would call and "request" inspections from USI only sometimes, when it needed them. 537 S.W.3d at 635. The record simply does not support this conclusion. In reality, Valero would notify USI *whenever Valero wanted to use a scaffold,* which would prompt USI to inspect as required by both OSHA guidelines and the USI and Valero scaffold policies. Valero would communicate each plan to use a scaffold because Valero employees *could not use* any USI-constructed scaffold without USI's permission, which was given via an updated tag following an inspection. Thus, Valero effectively delegated to USI the authority to ensure its employees' safety on the scaffolds USI constructs.

Throughout trial, several witnesses confirmed Lawrence's testimony. Maximo Cardenas, another Valero pipefitter who worked with Levine on the scaffold at the time of the accident, testified that the purpose of inspecting scaffolding before each shift is "locating things that need to be corrected." Charles Green, a Valero boilermaker, testified that each time modifications needed to be made to the scaffolding, USI would make them so that he and other workers could work comfortably. Additionally, Green testified that a Valero supervisor would contact USI "first thing in the morning" to inspect scaffolding or would contact USI whenever revisions to the scaffolding needed to be done. Kenneth Broussard, USI's Site Safety Coordinator, and Bob Travis, a USI superintendent, do not dispute this testimony. Broussard testified, among other things, that USI inspects thousands of scaffolds daily at the Valero facility. Travis also testified that USI inspects the scaffolds it constructs "[e]very day prior to [Valero employees] going to work on [them]." After Valero employees start working on the scaffold-

ing, they can call USI back to reinspect, when necessary. By his own testimony, Levine confirmed that he was aware of Valero's policy regarding scaffold use, that he was not allowed to use any scaffold unless it was inspected, that he believed the scaffold on which he was allegedly injured had been inspected, and that when he was a Valero supervisor he could have called USI if he needed "revisions or something on [the] scaffolding."

Consistent with Levine's allegations, the evidence presented at trial reflects USI's right to control the scaffolding it constructed. No Valero employee was authorized to construct, use, or dismantle a scaffold without first securing USI's permission. The fact that, practically speaking, USI did none of these without first receiving a work order notifying USI of Valero's scheduled use of a particular scaffold does not mean that USI lacked

the right to control that particular scaffold; after all, no general contractor can do the work it was hired to do without the property owner's instructions and access.[5] The fact that USI employees were not present on the premises after assembling the scaffold and before Valero notified USI of its scheduled, intended use—which would trigger USI's inspection to ensure the scaffold's safety before its use—does not mean that USI relinquished the right to control the scaffold in the interim. Rather, it simply means that USI had no reason to exercise its right to control the scaffold during that time.[6] The fact that Valero placed a restriction on its own employees' use of USI-constructed scaffolding—a mandate requiring USI to authorize the use of a scaffold following a proper inspection—shows that USI retained control over the

5. The dissent claims that USI did not have access to the scaffolding because it had to secure "work orders and permits" from Valero. 537 S.W.3d at 498. Yet the dissent ignores Levine's testimony and the testimony of other Valero employees that they, too, had to secure permits to work on the Valero refinery job site and had to turn in permits at the end of their work shift. To suggest that USI relinquished control of the premises because Valero places restrictions on property access or maintains safety guidelines for all who work on the premises—all of which we can only assume, based on the record before us, were in place when Valero contracted with USI—is to suggest that USI could never have had control of the premises in the first place. Indeed, if control requires unrestricted access to the premises, few contractors could ever establish the right to control the premises. We do not read the law to impose premises liability duties on contractors only when the owner has relinquished all right to control or restrict access to its property.

6. The dissent seems to contend that Levine's claim sounds in general negligence based on a line of cases originating with our 1962 decision in *Strakos v. Gehring*, 360 S.W.2d

787, 790 (Tex. 1962), in which we rejected the accepted-work doctrine and held that a contractor whose work created a dangerous condition on the property that ultimately caused injury is not immune from liability solely because his work was completed and accepted by the owner before the plaintiff's injury. 537 S.W.3d at 491–92 n.9. While we have suggested that a contractor in such circumstances could be liable based on general-negligence principles, we have not had occasion to consider a negligence claim brought under *Strakos* or how such a claim should be submitted to a jury. *See, e.g., Strakos*, 360 S.W.2d at 790–92, 802 (holding that the contractor was liable for failure to warn and make safe despite the owner's having accepted contractor's completed work); *Allen Keller*, 343 S.W.3d at 426 (holding that the contractor owed no duty to warn the public or rectify the unreasonably dangerous site condition); *Occidental*, 478 S.W.3d at 648–49 (holding that the former property owner breached no duty to plaintiff who was injured after property was sold to new owner). We do not address such claims here, as the record contains no evidence that USI's work on the subject scaffold was completed or that Valero had accepted USI's work.

scaffold from construction through dismantling. Essentially, once Valero placed USI in the sole position to authorize the use of scaffolds it constructed, USI attained the sufficient right to control those scaffolds. Because USI was obligated to inspect the scaffolds on any given day before Valero's workers used them, USI maintained the right to control the scaffolds until they were dismantled. Thus, Levine's allegations and the evidence establish that the nature of Levine's claim relies on USI's having retained the right to control the relevant part of the premises—the scaffold on which Levine alleges he was injured—such that USI had a responsibility to warn of or remedy a dangerous condition. *See Cty. of Cameron*, 80 S.W.3d at 556; *cf. Peña*, 442 S.W.3d at 265 (noting that the plaintiff bears the burden of proof on ownership or control and absence of any such evidence is fatal to the plaintiff's claim); *Allen Keller*, 343 S.W.3d at 426 ("As a general rule, 'a plaintiff must prove that the defendant possessed—that is, owned, occupied, or controlled—the premises where injury occurred.'" (citations omitted)).

### 4. Summary

We conclude, based on the source of Levine's injury, his pleadings and allegations, and the evidence presented at trial, that Levine's case sounds in premises liability. *See, e.g., Del Lago*, 307 S.W.3d at 776 (holding that the claim was properly tried and submitted as a premises liability case because the plaintiff's primary complaint, that his injury resulted from the defendant's nonfeasance tied to its failure to remedy an unreasonably dangerous condition, determined the character of his claim); *Warner*, 845 S.W.2d at 259 ("[W]e hold that [the plaintiff's] First Amended Original Petition, fairly read, alleged only a claim based upon premises liability." (citing *Corbin*, 648 S.W.2d at 295)).

The court of appeals improperly relied on the assumption that USI's control must be exclusive, believing that only one party can have control at a time. *See* 520 S.W.3d at 635, 2015 WL 5157837 (noting that USI failed to point to a contractual provision stating that USI was "the only entity" able to inspect the scaffolds and concluding that a Valero witness's testimony negated the argument that USI "solely controlled the premises"). But we have never required exclusive control in the premises liability context. We have merely required "sufficient control over the part of the premises that presented the alleged danger so that the defendant has the responsibility to remedy it." *Cty. of Cameron*, 80 S.W.3d at 556; *cf. Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993) ("[T]he court's inquiry must focus on who had specific control over the safety and security of the premises, rather than the more general right of control over operations.... If [the defendant] did not have any right to control the security of the station, it cannot have had any duty to provide the same."). The court of appeals' decision expanded the scope of the control inquiry to consider factors such as control of refinery operations, employee compliance with employer policies, and lay witness speculation as to who should be legally responsible if Valero conducted an inspection. 520 S.W.3d at 634–35, 2015 WL 5157837. But the relevant inquiry for determining what, if any, duties USI owed to Levine is USI's control over the scaffold itself. *See Cty. of Cameron*, 80 S.W.3d at 556; *Tidwell*, 867 S.W.2d at 23. Thus, the question is not whether Valero also had control, or even whether Valero had *more* control; rather, the duty question must focus on USI's right to control the scaffold and subsequent responsibility to warn about or remedy a dangerous condition on the scaffold. Levine's pleadings assert allegations that require USI to have had this

right, and USI does not dispute it. Moreover, the evidence establishes that Levine's allegations are based on USI's having sufficient control over the scaffold to owe Levine a duty of care as to dangerous conditions on the scaffold.[7] Levine's pleadings and the record evidence do not support his contrary assertion on appeal that USI had no control.

▮▮▮▮ Even if Levine attempted to characterize his claim as something other than premises liability, "[c]reative pleading does not change the nature of a claim." *Sampson*, 500 S.W.3d at 386 (citations omitted). "[I]f a claim is properly determined to be one for premises defect, a plaintiff cannot circumvent the true nature of the claim by pleading it as general negligence." *Id.* at 389 (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 230–33 (Tex. 2004)). Such creative pleading would allow plaintiffs to "plead around the heightened standard for premises defects, which requires proof of additional elements such as actual knowledge." *Id.* at 385. Likewise, one cannot transform the true nature of a claim by submitting it to the jury under a different theory of recovery. *See Olivo*, 952 S.W.2d at 529; *see also Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839–40 (Tex. 2000) (acknowledging that in *Olivo*, we implicitly concluded that general-negligence questions submitted in premises liability cases were "immaterial" because "absent any determination that the factual predicates giving rise to a legal duty were satisfied, the defendants' failure to use reasonable care was of no legal consequence" (citing *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 720 (Tex. 1995))).

▮▮▮▮ The dissent characterizes our opinion as "misstating" Levine's pleadings and the evidence. 537 S.W.3d at 636. But the dissent's recitation of Levine's pleadings and trial testimony supports our analysis. The dissent also characterizes our opinion as "misstating" the standard of review. *Id.* at 634. But the dissent mischaracterizes our analysis in *Olivo* in a veiled effort to overrule its holding.[8] Finally, the dissent seems to question our discussion of the controlling law and the duties applicable in this case. *Id.* at 487–88 n.3, 491–92 n.9. Yet our opinion addresses only a narrow legal rule with which the dissent seems to agree—a premises defect claim against a contractor who retained the right to control the premises at the time of the plaintiff's alleged injury must be submitted to the jury as a premises liability claim.

## C. Submission of Levine's Claim

▮▮▮▮ Just as Levine "cannot circumvent the true nature of [his] claim by pleading it as one for general negligence," he cannot creatively request jury questions that would do the same. *Sampson*, 500 S.W.3d at 389; *see also Torrington*, 46 S.W.3d at 839–40; *Olivo*, 952 S.W.2d at 529. Considering Levine's pleadings, the nature of the case, the evidence presented at trial, and the charge in its entirety, we conclude that the theory of recovery submitted to the jury did not reflect the claim that was raised by the pleadings and the evidence. *See* TEX. R. CIV. P. 278; *Island Recreational*, 710 S.W.2d at 555.

Because this case was submitted to the jury under only a general-negligence theory of recovery, without the elements of premises liability as instructions or definitions, the verdict "cannot support a recov-

---

7. *See supra* Part II.B.3.b.

8. *See supra* note 1.

ery in a premises defect case." *Olivo*, 952 S.W.2d at 529; *see also Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 990 (1949) (explaining that before a party is entitled to judgment, it must satisfy its burden of obtaining jury findings in its favor on every essential element of its claim). Having elected not to request a premises liability question or instruction and not to obtain findings on the premises liability elements, including knowledge, Levine waived his premises liability claim. *See* Tex. R. Civ. P. 279 ("[A]ll independent grounds of recovery … not conclusively established under the evidence and no element of which is submitted or requested are waived."). No basis remains for Levine to recover against USI. *See Olivo*, 952 S.W.2d at 529; *see also BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 403 & n.6, 2017 WL 1553112 (Tex. 2017) (rendering judgment in favor of the defendant when the plaintiff "submitted a theory upon which it could not recover" and failed to request and obtain findings to support judgment in its favor on a proper theory of recovery); *Torrington*, 46 S.W.3d at 839–40 (holding that general-negligence findings in the context of premises liability are immaterial).

### III. Preservation of Error

Levine argues that even if his claim should have been submitted under a premises liability theory of recovery, USI either waived the argument because it did not object to the jury charge or invited the error by requesting a general-negligence submission in the first trial. We first address Levine's argument that USI waived its submission argument by failing to object to the jury charge. A defendant has no obligation to complain about a plaintiff's omission of an independent theory of recovery; rather, the burden to secure proper findings to support that theory of recovery is on the plaintiff, and a plaintiff who fails to satisfy that burden waives that claim. Tex. R. Civ. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."). "If an entire theory were omitted from the charge it would be waived; and [the defendant] would indeed have no duty to object." *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990) (citing Tex. R. Civ. P. 279; *Strauss v. LaMark*, 366 S.W.2d 555, 557 (Tex. 1963)); *see also Olivo*, 952 S.W.2d at 529–30 (instructing that "a simple negligence question, unaccompanied by the *Corbin* elements as instructions or definitions, cannot support a recovery in a premises defect case" (citations omitted)).

We recognize, as USI points out, that a defendant must preserve error by objecting when an independent theory of recovery is submitted defectively. *See* Tex. R. Civ. P. 279. This includes when an element of that theory of recovery is omitted. *See id.* But when, as in this case, the wrong theory of recovery was submitted and the correct theory of recovery was omitted entirely, the defendant has no obligation to object. Were we to adopt Levine's argument that a defendant bears the burden to object to a jury charge not supported by the plaintiff's pleadings or the evidence adduced at trial, we would effectively force the defendant to forfeit a winning hand. Should the plaintiff fail to ensure that the trial court submits the appropriate theory of recovery to the jury, we see no reason to require the defendant to ask the trial court to fix an error that would, as here, ultimately result in a judgment in its favor.

Next, Levine argues that USI invited the charge error by requesting a general-negligence question in the first trial even though the same request was not

made in the second trial, which gave rise to this appeal. Levine's reliance on USI's actions in the first trial is misplaced. We have acknowledged that a defendant may invite error and waive its argument on appeal when it persuades a trial court to adopt a jury charge that it later alleges supports an improper theory of recovery. *See Del Lago*, 307 S.W.3d at 775–76 (holding that the defendant waived its ground for reversal by objecting to submission of negligent-activity theory at trial and then alleging on appeal that the proper theory of recovery was negligent activity). But here, once the trial court ordered a new trial, USI could invite error only in the second trial. *See Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 563 (Tex. 2005) ("[W]hen the trial court grants a motion for new trial, the court essentially wipes the slate clean and starts over."). The record reflects that USI did not invite error in the second trial.

 Finally, we hold that USI preserved its submission argument by raising it in a motion for judgment notwithstanding the verdict. USI cited *Olivo* in support of its request for a take-nothing judgment. This gave the trial court notice of USI's complaint that the verdict was based on an immaterial theory of recovery that could

not support Levine's recovery on a premises liability claim. *See* Tex. R. App. P. 33.1; *Torrington*, 46 S.W.3d at 839–40; *Olivo*, 952 S.W.2d at 529.

## IV. New Trial Order

USI challenges the trial court's order granting a new trial, contending that the trial court abused its discretion because the bases it provided for granting a new trial were facially insufficient and because sufficient evidence supported each jury finding in the first trial. *See In re Bent*, 487 S.W.3d 170, 173 (Tex. 2016) (orig. proceeding) (citing *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 213 (Tex. 2009) (orig. proceeding); *In re United Scaffolding, Inc.*, 377 S.W.3d at 688–89; *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013) (orig. proceeding)). While Levine argues that merits-based review of the new trial order was appropriate only through a mandamus proceeding,[9] USI asserts that appellate review of the new trial order after the second trial "is absolutely essential." The court of appeals held that the direct appeal of an order granting new trial is not permitted "once the order has merged into a final judgment." 520 S.W.3d at 636, 2015 WL 5157837.

---

9. Levine also makes three arguments that USI waived its right to object to the order granting a new trial. First, although USI twice pursued mandamus relief in this Court, USI did not object to the new trial order at issue or otherwise raise complaints in the trial court. *See* Tex. R. App. P. 33.1(a) (requiring preservation of a complaint in the trial court through timely request, objection, or motion stating specific grounds for ruling sought). Second, although USI complained in the court of appeals that the trial court erred in granting a new trial, USI failed to raise the specific arguments that it now makes in support of its position that the trial court abused its discretion. *See* Tex. R. App. P. 53.2(f) (stating that matters originating in the trial court should have been preserved for appellate re-

view in the trial court and assigned as error in the court of appeals). Third, although USI's petition for review contains arguments similar to those USI made in the court of appeals, Levine argues that USI never raised its specific complaints about the form and explanation of the new trial order until its brief on the merits in this Court. *See* Tex. R. App. P. 55.2(f) (stating that a petitioner's brief on the merits must be confined to issues or points stated in the petition for review); *Ramos v. Richardson*, 228 S.W.3d 671, 673 (Tex. 2007) (per curiam) (refusing to address an argument raised in petitioners' brief on the merits because petitioners failed to advance it in their petition for review). Because we do not decide USI's challenge to the new trial order, we also do not address Levine's preservation arguments.

This issue presents an interesting quagmire. We have recognized that appellate courts may "conduct a merits review of the bases for a new trial order" in an original proceeding and grant mandamus relief "[i]f the record does not support the trial court's rationale for ordering a new trial." *In re Toyota Motor Sales*, 407 S.W.3d at 749. We explained that "it would make little sense to conclude now that the correctness or validity of the orders' articulated reasons cannot also be evaluated." *Id.* at 758. Yet "mandamus will issue only to correct a clear abuse of discretion or the violation of a duty imposed by law when an adequate remedy by appeal does not exist." *In re Columbia Med. Ctr.*, 290 S.W.3d at 207 (citations omitted). USI admits that it could have sought merits-based review by filing a petition for writ of mandamus before the second trial began. But USI declined to do so and opted instead to move forward with the second trial. USI now urges us to, in essence, void its choice, arguing that "mandamus is never compulsory." Levine counters by asserting that our decisions allowing merits-based mandamus review of new trial orders have essentially held that such "litigants do not have an adequate remedy on appeal."

We do not reach this issue, however, because our holding on the submission issue results in rendition of judgment in USI's favor, provides all the relief USI requests, and forecloses consideration of additional issues that do not provide the greatest relief. *See CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000) (declining to reach a venue question that would potentially result in remand after deciding a legal-sufficiency question that resulted in rendition); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam) ("Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief."). With this ruling, USI concedes that we need not reach its challenge to the trial court's order granting a new trial.

## V. Conclusion

Considering Levine's pleadings, the nature of the case, the evidence presented at trial, and the jury charge in its entirety, we hold that Levine's claim is properly characterized as one for premises liability. Levine's failure to request or secure findings to support his premises liability claim, therefore, "cannot support a recovery" in this instance. *Olivo*, 952 S.W.2d at 529. Additionally, USI was under no obligation to object to Levine's submission of an improper theory of recovery, and USI preserved its improper-theory argument by raising it in a motion for judgment notwithstanding the verdict. *See* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 279. Accordingly, we reverse the court of appeals' judgment and render a take-nothing judgment in USI's favor. We decline to reach the issue of whether a party may challenge a new trial order by direct appeal following the completion of the new trial, as resolution of the submission issue affords USI all the relief it has requested.

Justice Boyd filed a dissenting opinion, in which Justice Lehrmann and Justice Devine joined.

Justice Boyd, joined by Justice Lehrmann and Justice Devine, dissenting.

James Levine was injured while working at his employer's refinery when he fell through the platform of a scaffold. According to Levine, a piece of plywood that should have been nailed into the platform but was not slid out from under him, causing him to fall through the resulting hole. As a result of this so-called "slip-and-fall,"

*ante* at 472–73, Levine strained his neck. A jury awarded him nearly $2 million. That's a lot of money for a neck strain.[1] But the defendant—United Scaffolding, Inc. (USI)—does not merely complain about the amount of damages. Instead, USI argues that Levine cannot recover at all because the trial court asked the jury an ordinary-negligence question instead of a premises-liability question. Ironically, USI itself proposed the ordinary-negligence question and never withdrew that proposal. Nevertheless, the Court agrees with USI, reverses, and renders a take-nothing judgment. I respectfully dissent.

## I.

### Misstatements

The jury found that USI's negligence proximately caused Levine's injuries. The trial court rendered judgment on that verdict, and the court of appeals affirmed. 520 S.W.3d 631, 2015 WL 5157837. The Court now reverses and renders judgment for USI, holding Levine could not recover from USI based on ordinary negligence, and instead could only have recovered based on premises liability. To reach that result, however, the Court misstates the standard of review, the pleadings, and the evidence.

### A. The standard of review

"Control" determines the outcome of this case. As the Court explains, premises liability applies if USI controlled the scaffold on which Levine was injured and thus had "responsibility for dangerous conditions on it." *Ante* at 474 (quoting *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016)). Whether USI owed Levine a premises liability duty "must be determined by examining whether USI maintained a right to control the scaffold that allegedly caused Levine's injury." *Id.* at 474. More specifically, premises liability applies only if USI had the right to control the premises both *where* and *when* Levine's accident occurred. *See Cty. of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002); *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53–54 (Tex. 1997).[2] Premises-liability duties "generally run[ ] with the ownership or control of the property" and do not apply to a contractor who does not "own or control the premises *at the time of [the] accident.*" *Occidental*, 478 S.W.3d at 643–44 (emphasis added). Because "the essential element" of a premises-liability claim is the defendant's control of the premises "*on the date in question,*" premises liability does not apply to a contractor who does not control the premises when the accident occurs. *Lefmark*, 946 S.W.2d at 53–54 (emphasis added).

USI contends that the ordinary-negligence question the jury answered at trial was erroneous and the trial court should not have submitted it because USI con-

---

1. When the parties first tried the case, the jury awarded $178,000, which seems much less surprising for that kind of injury. *See, e.g., Hospadales v. McCoy*, 513 S.W.3d 724, 729 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ($292,000); *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 587 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ($679,627.02); *Metro. Transit Auth. v. McChristian*, 449 S.W.3d 846, 849 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ($27,650); *Gothard v. Marr*, 581 S.W.2d 276, 278 (Tex. Civ. App.—Waco 1979, no writ) ($21,666.55). The trial court granted Levine's motion for new trial, however, and the second jury awarded nearly $2 million.

2. *See also Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999) (per curiam) ("As a rule, to prevail on a premises liability claim a plaintiff must prove that the defendant possessed—that is, owned, occupied, or controlled—the premises where injury occurred.") (citing *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986)).

trolled the scaffold when Levine's injury occurred. The Court agrees, holding USI owed only premises-liability duties because "Levine's allegations and the evidence *establish* that the nature of Levine's claim relies on USI's having retained the right to control" the scaffold when the accident occurred. *Ante* at 479 (emphasis added). But the Court does not explain what it means when it says the evidence "establishes" control. Although the Court apparently rejects the idea that the evidence must *conclusively* establish control, it ultimately ignores the evidentiary-review standard altogether. By doing so, it misstates and misapplies our well-established standard of review.

Under our clear and consistent precedent, we may conclude that the ordinary-negligence question was erroneous and the trial court should not have submitted it to the jury only if it has "no basis in the law or the evidence." *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 215 (Tex. 2005); *see Harris Cty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002) ("[T]he trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence."); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (explaining trial courts' duty "to submit requested questions to the jury if the pleadings and any evidence support them"); *see also* TEX. R. APP. P. 61.1(a) (stating that this Court may not reverse a judgment unless the complained-of error "probably caused the rendition of an improper judgment"). USI does not contend that an ordinary-negligence question has "no basis in the law," so it must instead establish that "no evidence" supported its submission to the jury. *See Romero*, 166 S.W.3d at 215; *see also Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999) (holding trial court should not have submitted breach-of-implied-warranty claim because "no evidence" supported it). To prevail on its

argument that the trial court should not have submitted the ordinary-negligence question, USI must establish that *no* record evidence supports the jury's ordinary-negligence finding. *See Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex. 1965) (holding trial court errs in submitting question to jury only if no evidence supports the question).

If the ordinary-negligence question "is supported by *some* evidence," Levine was "entitled to have [the question] submitted to the jury," *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995) (emphasis added), and the trial court would have abused its discretion by refusing to submit it, *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (concluding trial court abused its discretion by refusing to submit jury instruction "supported by the pleadings and evidence"). So we must focus on whether the allegations and evidence support the ordinary-negligence theory USI proposed and the trial court submitted at trial. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986) (holding trial court properly submitted jury issues because "there is some evidence to support submission of these issues"). To answer that question, "we must examine the record for evidence supporting [the question] *and ignore all evidence to the contrary.*" *Elbaor*, 845 S.W.2d at 243 (emphasis added).

The Court does not apply this standard of review. In fact, the Court never explains what evidentiary standard it applies. On the one hand, it asserts that the evidence "establishes" and "compel[s]" the conclusion that USI had a right to control the scaffold and "do[es] not support" Levine's assertion "that USI had no control." *Ante* at 469, 480. On the other hand, the Court asserts merely that the evidence "reflects" or is "consistent" with an allegation that USI controlled the scaffold. *Id.* at 634,

2015 WL 5157837. The Court expressly rejects our well-established standard of review as "inapplicable" and asserts that our review does not depend on "some sort of sufficiency-of-the-evidence standard." *Id.* at 470 n.1.

According to the Court, we determine the claim's proper nature "by first determining the source of the plaintiff's alleged injury—premises defect—and then determining the duties owed, concluding that the general contractor defendant owed the plaintiff premises duties *if it retained a right to control the work that created the dangerous condition.*" *Id.* at 470 n.1 (emphasis added) (citing *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 528–29 (1997)). But we can only know whether the defendant "retained a right to control the work" by looking to evidence in the record, so we necessarily must apply "some sort of sufficiency-of-the-evidence standard." Presumably (and contrary to our precedent), the Court believes we can conclude that USI retained a right to control the work if *some* evidence supports that conclusion, even if other evidence establishes the contrary. But the Court avoids the issue by refusing to say what evidentiary-review standard it is applying. Even though our determination of whether USI controlled the scaffold necessarily depends on the record evidence, the Court simply ignores the evidentiary-review standard altogether.

As the Court notes, we determine whether a trial court submitted an erroneous jury question by considering "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *Ante* at 469 (quoting *Hawley,* 284 S.W.3d at 862). But we consider these to determine whether any allegations and evidence support the question the court submitted at trial, not whether any allegations and evidence would support a different question the defendant urges on appeal. If the ordinary-negligence question is "raised by the written pleadings and the evidence," it is not erroneous and the trial court *must* submit it. Tex. R. Civ. P. 278; *Rodriguez,* 995 S.W.2d at 663. This "substantive, non-discretionary directive" *requires* trial courts "to submit requested questions to the jury if the pleadings and *any* evidence support them." *Elbaor,* 845 S.W.2d at 243 (emphasis added). "A trial court may refuse to submit an issue only if *no evidence* exists to warrant its submission." *Id.* (emphasis added).

The Court asserts that whether Levine's claim sounds in ordinary negligence or premises liability is a "legal question" we review de novo, because the question of whether "a condition that allegedly caused the plaintiff's injury *is a premises defect* is a legal question." *Ante* at 469 (emphasis added) (citing *Sampson v. Univ. of Tex. at Austin,* 500 S.W.3d 380, 385 (Tex. 2016)). But we need not decide whether the condition that caused Levine's injury was a premises defect—no one disputes that it was. Instead, we must decide whether USI controlled the premises where and when Levine's injury occurred. And though "the character of Levine's claim" may be a "legal question," *ante* at 470 n.1, we must answer the question based on *"the facts surrounding the occurrence in question."* *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995) (emphasis added). When, as here, the answer depends on whether USI had a right to control the scaffold, we may only answer the question as a matter of law if the evidence is legally insufficient to establish control—or on the other hand, conclusively establishes control. *See id.* at 199 (concluding that "no facts" supported even "a fair inference" of control); *see also Gonzalez v. Ramirez,* 463

S.W.3d 499, 506 (Tex. 2015) (concluding that "even in the light most favorable to [the plaintiff], no evidence shows that [defendant] controlled, operated, or directed the operation of the trucks involved in the hauling operations at issue"); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 224 (Tex. 1999) (holding that plaintiff's evidence was not "legally sufficient evidence of the premises owner's 'right to control' in a premises liability case").

Ultimately, the Court bases its approach on a misreading of our decision in *Olivo*, in which we "explicitly required that the trial court submit the [premises-liability] elements in a premises defect case" and held that because the plaintiffs "did not obtain a jury finding that included essential elements of their premises defect claim, they cannot recover." *Ante* at 470 n.1 (quoting

*Olivo*, 952 S.W.2d at 529). According to the Court, we can ignore our well-established standard of review in this case because, pursuant to *Olivo*, "a premises defect case improperly submitted to the jury under only a general-negligence question, without the elements of premises liability as instructions or definitions, causes the rendition of an improper judgment." *Id.* at 469–70, (citing *Olivo*, 952 S.W.2d at 529).

But it was undisputed in *Olivo* that the contractor controlled the premises where and when the injury occurred. 952 S.W.2d at 526–27 (explaining that the contractor "operated" the oil and gas lease and had an "on-site representative" on the premises where and when the injury occurred); *see id.* at 527 (explaining that the contractor "occupied the leased land").[3] The issue

---

**3.** What *was* disputed in *Olivo* (and is *not* at issue here) was "what duty, if any," the "contractor in control" of the premises owed to an "employee of an independent contractor." 952 S.W.2d at 527. Because the general contractor occupied and controlled the premises, it owed duties that could give rise to "two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *Id.* (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985)). Because the independent contractor's employee alleged only that he was injured by equipment "previously left on the ground," and "not as a contemporaneous result of someone's negligence," *Olivo* was necessarily "a premises defect case." *Id.* The question in *Olivo* was whether a contractor that indisputably occupied and controlled the premises where and when the accident occurred was liable for a dangerous condition that injured an independent contractor's employee.

When, as in *Olivo*, the dangerous condition "aris[es] out of the independent contractor's work," the general contractor who controls the premises only owes a duty to the independent contractor's employee if the general contractor retained "supervisory control" over *the independent contractor's work* and that control "relate[d] to the condition or activity

that caused the injury." *Id.* at 528. The controlling factor in *Olivo* was whether the contractor had a "right to control the [independent contractor's] defect-producing work," *id.* at 529; the fact that the contractor controlled the premises where and when the injury occurred—and thus owed premises-liability duties—was simply undisputed. Because it was undisputed that the contractor controlled the premises where and when the injury occurred and that the employee's injury resulted from a dangerous condition on the premises, his claim was necessarily a premises-liability claim. And because the independent contractor created the dangerous condition, the plaintiff had to prove that the contractor controlled the independent contractor's work. *Id.*

I do not, as the Court asserts, suggest that *Olivo* should be overruled. *Ante* at 470 n.1. Because Levine was not USI's subcontractor's employee and Levine's employer did not create the dangerous condition, the *Olivo* issue of whether USI controlled the "defect-producing work" is simply irrelevant here. *Olivo* did not involve the issue of whether the pleadings and evidence conclusively established that the contractor occupied and controlled the premises at the time of the injury; it was simply undisputed that it did. We said in *Olivo* that the trial court was required to "submit the [premises-liability] elements in a premises de-

in *Olivo* was whether the contractor controlled an *independent contractor's work* that created the dangerous condition on the premises, not whether the contractor occupied or controlled *the premises where and when the injury occurred. Id.* The evidence in *Olivo* conclusively established that the contractor controlled the premises. Because that fact was undisputed, we explained that the "contractor in control" was "charged with the same duty as an owner or occupier," so the plaintiff could only bring a premises-liability claim and had to prove the unique elements of that claim. *Id.* at 527, 529.

By ignoring this crucial distinction, the Court reaches a result that is inconsistent with the well-established principle that premises liability applies to a contractor who controlled or had the right to control the premises where and when the injury occurred. *Occidental,* 478 S.W.3d at 643–44; *Lefmark,* 946 S.W.2d at 54. The Court agrees with this principle, explaining that "a defendant's liability under a premises liability theory rests on the defendant's assumption of control of the premises and responsibility for dangerous conditions on it." *Ante* at 474. But relying on *Olivo,* the Court asserts that any claim based on an injury that results from a "premises defect"—a dangerous condition on the premises—must necessarily be a premises-liability claim. *Id.* at 470 n.1 (asserting that in *Olivo* we "considered the character of the plaintiff's claim by first determining the source of the plaintiff's alleged injury—premises defect"). A claim based on a "premises defect," however, must necessarily be a premises-liability claim *only* if

the defendant owned, occupied, or controlled the premises where and when the injury occurred.[4] The Court errs by assuming that any claim based on injury caused by a dangerous premises condition must necessarily be a claim for premises-liability, even if the defendant did not control the premises where and when the injury occurred.

To prevail on this appeal, USI must demonstrate that Levine *only* alleged or that the evidence *conclusively* established that USI controlled or had the right to control the scaffold when Levine was injured. *See Sw. Energy Prod. v. Berry-Hefland,* 491 S.W.3d 699, 713 (Tex. 2016) (explaining that evidence is legally insufficient if "evidence of a vital fact is completely absent" or the evidence "establishes conclusively the opposite of a vital fact"). To the extent the Court concludes USI has met that burden, it is only because the Court misstates the pleadings and the evidence as well.

## B. The pleadings

The Court misstates Levine's pleadings by asserting he alleged USI controlled the scaffold when Levine suffered injury and he thus alleged *only* a premises-liability claim. *Ante* at 479. In fact, he alleged only that USI controlled the scaffold when it constructed the scaffold at least a week before Levine's injury, and he asserted only a general "negligence" claim. To the extent he alleged facts that could support either a premises-liability claim or an ordinary-negligence claim, he expressly pled his allegations in the alternative.

fect case" because it was undisputed that *Olivo* was a premises-liability case. 952 S.W.2d at 529.

4. If a claim results from a premises defect that a contractor created but the contractor relinquished control of the premises before

any injury occurred, the contractor may be liable for ordinary negligence for creating the defective condition, but cannot be liable under premises liability. *See infra* n.9. Control "on the date in question" is "the essential element" of a premises-liability claim. *Lefmark,* 946 S.W.2d at 54.

Levine alleged he was injured on December 26, 2005, at the Port Arthur Valero facility "while working on a scaffolding[,] which had been erected/constructed/supervised/built by" USI and its superintendent, Bob Travis. According to the petition, Levine "fell into a[n] opening caused by [USI's] failure to secure, or, at a minimum, properly secure flooring on the scaffolding." Levine alleged the "incident and all damages and injuries resulting therefrom ... were caused solely by the acts, wrongs, and/or omissions of [USI]." Based on these facts, Levine asserted that USI was "guilty of certain acts, wrongs, and/or omissions, *each and all amounting to negligence.*" (Emphasis added).

The Court asserts that the "only fair reading of Levine's pleadings" necessarily "*requires* the determination that Levine did in fact allege that USI assumed and retained the right to control the scaffolding it constructed." *Ante* at 475 (emphasis added).[5] Based on this "fair reading" of Levine's petition, the Court concludes that Levine's claim necessarily sounds only "in premises liability." *Id.* at 634.

Levine's petition, however, *never* alleged that USI controlled the scaffolding at the time of the accident. In the entire petition, the only allegation regarding "control" asserted USI "had direction, control and supervision *over the erection/building of the scaffolding,*" which necessarily occurred before the accident. (Emphasis added). I agree we could fairly read Levine's petition to allege that USI created a dangerous condition on Valero's premises by negligently constructing and erecting the scaffold. I also agree that, if the petition could only be read to allege that USI controlled the scaffold at the time of the accident, Levine necessarily asserted a premises-liability claim. *See Austin v. Kroger Tex., L.P.,* 465 S.W.3d 193, 215 (Tex. 2015). But that is not the "*only* fair reading of Levine's pleadings." *Ante* at 475 (emphasis added).

Levine alleged that USI committed twenty specific acts of "negligence," but contrary to the Court's assertion, not one of those acts *required* that USI have the right to control the scaffold when the accident occurred. Fifteen of the specified acts, wrongs, or omissions alleged negligent conduct that USI could have committed either before or at the time of the accident, and thus may—but need not—be read to *imply* that USI had the right to control the scaffold when the accident occurred.[6] The other five specific acts, wrongs, or omissions, however, alleged negligent conduct that USI could only

---

**5.** It is not clear to me whether the Court intends to say that a fair reading of Levine's petition requires the conclusion that he necessarily alleged (among other allegations) that USI retained control of the scaffold at the time of the accident, or whether the Court intends to say that a fair reading of the petition requires the conclusion that he necessarily *only* alleged that USI retained such control. If the former, then the Court's assertion does not support the Court's conclusion. *See* Tex. R. Civ. P. 278; *Rodriguez,* 995 S.W.2d at 663. If the latter, then the Court simply misstates the pleadings.

**6.** Specifically, the petition alleged that USI was negligent in:

- "failing to adequately determine dangerous conditions created;"
- "failing to adequately warn [Levine] of measures to protect himself from harm;"
- "failing to adequately inspect the scaffolding;"
- "expressly implying the scaffolding was safe for its intended purposes;"
- "failing to correct the dangerous condition which existed with the scaffolding;"
- "failing to maintain the scaffolding in a proper and safe work condition;"
- "failing to secure the scaffolding in a proper and safe work condition;"

have committed before the accident occurred.[7] These five allegations necessarily asserted liability that does not depend on USI having the right to control the scaffold when the accident occurred and thus do not support the Court's inference that Levine necessarily alleged such control. To the extent the Court asserts the petition necessarily only alleged liability that required USI to control the scaffold at the time of the accident, the Court conspicuously fails to address these five allegations.

Even if Levine alleged facts "inconsistent with the position ... that USI lacked control of the premises at the time of his injury," *ante* at 475, he indisputably also alleged facts consistent with that argument. Levine's allegations that USI improperly assembled, erected, and secured the scaffold, inadequately trained and instructed its agents and employees on properly erecting and securing the scaffold, and erected the scaffold in violation of OSHA standards and its own policies are completely unrelated to any control over the scaffold when the accident occurred. And to the extent any of the alleged negli-

- "failing to warn [Levine] that a dangerous condition existed which required extra care to be taken by him while working on the scaffolding;"
- "failing to properly train its employees in recognition of hazards;"
- "failing to promulgate safety practices and administer a proper safety program designed to prevent this type of injury;"
- "failing to provide [Levine] with a safe working environment;"
- "failing to enforce proper safety codes, rules, standards and practices;"
- "failing to properly instruct;"
- "failing to properly supervise;" and
- "failing to ensure the safety of the workers attempting to use the scaffolding."

All of these allegations assert actions or inactions that USI could have committed before it ever built the scaffold (*i.e.*, failure to train, instruct, supervise, promulgate safety practices, etc.), when it built the scaffold (*i.e.*, failure to warn, correct, enforce safety codes, etc.), or right after it finished building the

gent acts necessarily asserted USI retained control at the time of the accident, Levine expressly pleaded everything "in the alternative."

The Court also asserts that "the only fair reading of Levine's allegations is that his injury resulted from a physical condition on the property—a hole in the scaffold platform, covered by an unsecured sheet of plywood—and not some contemporaneous activity." *Id.* at 473. This assertion is true but irrelevant. The distinction we have drawn between injuries resulting from premises conditions and injuries resulting from contemporaneous activities is only relevant if the defendant owned or controlled the premises where and when the injury occurred. Specifically, we have held that a contractor who controls the premises at the time of the injury, like a property owner who owns the premises at the time of the injury, has both premises-liability duties and an "independent duty ... not to injure bystanders by its activities." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005) (citing *Redinger*, 689 S.W.2d at 417). Thus, a premises-controlling contrac-

scaffold, at least a week before Levine's accident (*i.e.*, failure to inspect, correct, maintain, etc.).

7. Specifically, the petition alleged that USI was negligent in:

- "improperly assembling, erecting and/or securing the scaffolding;"
- "failing to provide sufficient training and instruction to its agents, servants, employees and/or representatives on the proper erection and use of the scaffolding;"
- "failing to provide sufficient training, warnings and instruction to its agents, servants, employees and/or representatives on the proper assembly, erecting and securing of the scaffolding;"
- "failing to erect the scaffolding in compliance with minimum OSHA standards;" and
- "erecting a scaffolding in violation of Defendant(s) own company policies."

tor's liability to an injured party depends on whether the injury results from a dangerous condition on the premises (in which case, the contractor can only be liable under premises liability) or from the contractor's contemporaneous negligent activity (in which case, the contractor can be liable for ordinary negligence). *Austin*, 465 S.W.3d at 215. But this distinction is irrelevant if the contractor does not control the premises where and when the injury occurs because such a contractor cannot be liable under premises liability at all. *Lefmark*, 946 S.W.2d at 54.

We have relied on the condition/activity distinction in numerous cases, but *only*

when the defendant owned, occupied, or controlled the premises when the injury occurred.[8] So the fact that Levine necessarily alleged that a condition of the scaffold caused his injuries is irrelevant unless he also necessarily alleged only that USI controlled the scaffold when the injury occurred. Otherwise, if a condition of the scaffold caused Levine's injuries after USI relinquished control of the scaffold, Levine's only proper claim against USI sounds in "ordinary negligence," not in premises liability. *Occidental*, 478 S.W.3d at 647 (emphasis added).[9]

The Court's assertion that Levine creatively "attempted to characterize his claim

---

8. *See, e.g., Sampson*, 500 S.W.3d at 388 (applying activity/condition distinction to determine proper claim against property owner); *Occidental*, 478 S.W.3d at 644 (applying distinction to determine proper "claim against the property owner"); *Austin*, 465 S.W.3d at 215 (discussing distinction in connection with claim against "the landowner"); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775 (Tex. 2010) (discussing distinction of claims "[a]s to landowners"); *Timberwalk Apartments Partners v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (applying distinction to determine claim against a "landowner"); *Olivo*, 952 S.W.2d at 527 (applying condition/activity distinction to determine proper claim against contractor who "occupied" land and was "in control of the premises"); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (applying distinction to claim against grocery-store owner); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992) (applying distinction to determine proper claim against grocery-store owner); *Redinger*, 689 S.W.2d at 417 (discussing distinction as to claims against a "general contractor on a construction site, who is in control of the premises"); *Massman-Johnson v. Gundolf*, 484 S.W.2d 555, 556 (Tex. 1972) (applying distinction to determine proper claim against contractor in control of the premises).

9. A claim against a contractor who created a dangerous condition but then relinquished control of the premises before any injury occurred is necessarily based not on a premises-

liability duty to warn about or remedy a dangerous condition, but on "a duty *in negligence* to use reasonable care not to create the dangerous condition in the first place." *Occidental*, 478 S.W.3d at 642 (emphasis added). The contractor's duty in such circumstances is tied not to the contractor's control of the premises but "to the quality of its contracted work." *Id.* at 646–47; *see Allen Keller*, 343 S.W.3d at 424 (explaining that "general negligence principles apply" to such a claim); *Weekley Homes*, 180 S.W.3d at 132 (explaining that such a claim is no "different from what any bystander might assert" against the contractor for breach of its "independent duty . . . not to injure bystanders by its activities"—in other words, an ordinary-negligence claim); *Strakos v. Gehring*, 360 S.W.2d 787, 790–91 (Tex. 1962) (explaining that even though the injury arises from a condition on the premises, the contractor's continuing liability after relinquishing control of the premises involves "the basic questions of negligence and proximate cause" because it arises from its "failure to use ordinary care" in performing the work, not its failure to warn of or remedy the dangerous condition), 792 (explaining that the contractor's "basis for liability" is that "the contractor's work has been negligently performed"), 794 (explaining that the contractor's post-control liability "is grounded in the public policy behind the law of negligence"). We confirmed in *Occidental* that the contractor's breach of its ordinary-negligence duty "may be judged . . . even

as something other than premises liability" simply misstates his petition. *Ante* at 480. Levine's petition never asserted that USI had a right to control the scaffold when the injury occurred, and it asserted ordinary-negligence claims that do not depend on USI having such control. It is true that Levine cannot "circumvent the true nature of [his] claim by pleading it as one for general negligence." *Id.* at 480 (quoting *Sampson*, 500 S.W.3d at 389). But Levine's petition unambiguously asserted ordinary-negligence claims that did not necessarily require, assert, or imply that USI controlled the scaffold when the accident occurred. So if USI is to meet its burden to demonstrate that the trial court erroneously submitted an ordinary-negligence claim, it must demonstrate that the evidence conclusively established that USI controlled the scaffold. Unfortunately, the Court misstates the evidence as well.

## C. The evidence

As the Court explains, neither party disputes that USI is a contractor Valero hired to install, inspect, modify, and dismantle scaffolding at its Port Arthur refinery. *Id.* at 632. Nor do the parties dispute that USI built the scaffold at the refinery at least a week before Levine's accident. *Id.* at 633. And they agree that no USI employees were present at the refinery "on the date of, and at least three days preceding, Levine's injury." *Id.* at 634–35. Nevertheless, the Court asserts that the evidence supports its conclusion that USI had the right to control the scaffold when Levine's accident occurred. *Id.* at 635–36. Again, to the extent the Court asserts that *some* evidence supports that conclusion, its assertion is insufficient to establish that the ordinary-negligence question was erroneous. *See* TEX. R. CIV. P. 278; *Rodriguez*, 995 S.W.2d at 663. And to the extent the Court asserts that the evidence *conclusively establishes* that USI had the right to control the scaffold when the accident occurred, the Court misstates the evidence.

Specifically, the Court misstates the evidence by asserting that the evidence conclusively established that (1) USI had a duty to inspect every scaffold at the Valero refinery before every work shift, *ante* at 467; (2) only USI could inspect the scaffolds and authorize their use, *id.* at 635; (3) USI had access to the scaffolds without obtaining Valero's permission, and Valero had no right to access the scaffolds without obtaining USI's permission, *id.* at 635; and (4) USI therefore had a right to control the scaffold at the time of the accident, *id.* at 635. In fact, at least some evidence establishes that (1) USI had no obligation to inspect any scaffold unless and until Valero asked USI to inspect it; (2) Valero's carpenters could also inspect the scaffolds and authorize their use; (3) USI could not access any scaffold without first obtaining a permit from Valero, but Valero could access any scaffold without first obtaining USI's permission; and (4) USI had no right to control the scaffold when Levine's accident occurred.

### 1. Duty to inspect

Citing to USI's and Valero's policies and to OSHA regulations, the Court asserts that the evidence establishes that "USI was required to inspect the nearly three thousand scaffolds at the refinery before each work shift and before each scaffold's use." *Id.* at 467. In fact, although the evi-

---

after the contractor no longer controls the premises." *Occidental,* 478 S.W.3d at 647; *see also Weekley Homes,* 180 S.W.3d at 132 (not-

ing that contractor's liability remains for creating "premises conditions it leaves behind") (citing *Strakos,* 360 S.W.2d at 790).

dence does establish the scaffolds had to be inspected "before each use," it also establishes that USI only had to inspect any particular scaffold before a shift in which that scaffold would actually be used, and only when Valero notified USI that it would be used.

The only testimony about inspecting a scaffold before a "shift" was from Kenneth Broussard, USI's safety coordinator at the Valero site. Contrary to the Court's assertion, what Broussard actually said was that "many" of the scaffolds—not all—had to be inspected before each shift:

Q. Now, at the time of the accident, sir, United Scaffolding had several thousand scaffolds out at Valero, correct?

A. Yes.

Q. And many of those scaffolds had to be updated every shift—

A. Yes.

Broussard explained that "a lot" of scaffolds were at the refinery on any given day, but they were not all used every day:

Q. And are all of those in service at the same time?

A. Sometimes. Sometimes not. Sometimes they prebuild. Sometimes they build them right when they need them. Sometimes they stay up for a while before they get on them. So, there are all different times they build them.

He went on to explain that when USI first constructed a scaffold on Valero's premises, USI was required to inspect the scaffold at that time and "update" its inspection tag to authorize its use on that date:

Q. ... You have to update the scaffold when you finish building it, correct?

A. You put a date on it the day you build it.

Q. Because you inspect it when you finish, right?

A. That's correct.

. . . .

Q. —the minute you finish construction, you have to inspect the scaffold, correct?

A. Yeah. It's inspected when you tag it.

Q. Okay. And at that point it is ready to use that day, that shift?

A. Yes.

After construction, an inspection tag had to be updated before any subsequent shift during which the scaffold would be used:

Q. Now—and those scaffolds would have to be updated prior to use?

A. Prior to use.

Q. Okay. Just because you-all built them and nobody was on them doesn't mean something hasn't changed on them?

A. That's correct.

Q. Even if it's built two weeks past, the morning that they are to get on them, is it supposed to be inspected?

A. Yes.

Maximo Cardenas, another Valero pipefitter who was working on the scaffold when Levine fell, testified that a scaffold tag had "to be updated every day" and "every morning." But every other witness—including Valero's and USI's supervisors—clarified, consistent with Broussard's testimony, that inspections were required only for days on which the scaffold would be used. And USI was only required to conduct the inspection if Valero notified USI of its plan to use the scaffold and asked USI to inspect it.

Tony Lawrence, Valero's maintenance supervisor, explained that USI was required to construct or inspect a scaffold only if Valero gave USI a work order letting it know that a scaffold was needed at a particular location on a particular day:

Q. Is there something that Valero sends to United Scaffolding to let them know what scaffolds are going to be used on a daily basis?

A. Yes. If you need a scaffold, it's a work order go through the—that was generated through the computer. And what we do is we run a copy of it and give it to United Scaffolding, saying what size scaffold we need and what location we need the scaffold on.

. . . .

Q. Do you-all give anything to United Scaffolding to let them know which of those scaffoldings you-all would be using on a daily basis, to your knowledge?

A. The way it's set up is that if you have scaffolding up and the scaffold has been up two or three days now and you see where you're going to use the scaffolding the next day, normally there's a procedure where you call Bob [Travis, USI's superintendent] and let him know the day before. And they go out the next day before you get there and update scaffolds.

. . . .

Q. You said that Valero does send notice to United Scaffolding the day before to let them know what scaffold Valero would be using the next day, correct?

A. Correct.

Charles Green, a Valero boilermaker, confirmed this and explained that Lawrence would contact USI and let it know when a particular scaffold needed to be "revised" or its tag needed to be updated:

Q. Now, when those revisions or changes in the scaffolding needed to be done, who typically would call

United Scaffolding for that? Would that be you or—

A. The supervisor.

Q. —Mr. Lawrence?

A. (Witness moves head up and down)

Q. Is that a "yes"?

A. Yes.

. . . .

Q. Do you know if there is any policy or procedure regarding inspection of scaffoldings before they are to be used?

A. Yes.

Q. And what do you know about that?

A. We normally get them to update the scaffolding.

Q. When?

A. The first thing in the morning.

. . . .

Q. And how would you-all let United Scaffolding know which scaffolds that are already there that needed to be updated?

A. We tell the supervisors, and our supervisors notify United Scaffolding.

Q. And, so, this one would have been Tony Lawrence?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And they would notify, you said, United Scaffolding?

A. Yes.

Q. Do you know who at United Scaffolding they would notify?

A. Bob [Travis].

. . . .

Q. But you're aware of that policy?

A. Yes. All I know is that we notify that we need an update on a scaffolding; and they come out and update it—look at it and update it.

Travis, USI's superintendent, confirmed that USI was not required to inspect a scaffold unless Valero notified it to do so:

Q. After you guys put up a scaffolding, do you-all ever go by and periodically inspect it or look at it?

A. Every day prior to them going to work on it.

Q. Okay. How about after they start working on it?

A. When we [were] called.

Q. Okay. Do you have to be called or—

A. Yes.

Daniel Benoit, USI's supervisor at the Valero refinery, explained that USI only made revisions to a scaffold if Valero contacted Travis and asked USI to do so, and only inspected the scaffolds when they were first constructed and then upon Valero's request before each subsequent use:

Q. What was the practice—back in December, 2005, at Valero, what was the practice on United Scaffolding making revisions? And, by that, I mean, how do you-all know when to make revisions?

A. We're contacted to go.

Q. Who contacts you?

A. Bob tells me.

Q. And who would contact Bob?

A. Whoever would need the revisions.

. . . .

Q. Do you have to inspect it once it's completed?

A. Only prior to their use.

Q. Okay. Well, what about before you put the tag on it?

A. Oh, yes.

Q. Okay. So, once it's completed, you look at it and then you put a tag on it?

A. Yes, ma'am.

And finally, Levine explained that Valero would make sure that the scaffolds were inspected before he used them:

Q. And one of the things a refinery makes sure of is if the scaffolding gets inspected before you get out there to do your job, right?

A. That's correct.

Q. If the scaffolding had not been inspected, would they allow you to go out there and start working?

A. No.

. . . .

Q. And when you were a supervisor during those times, you, if you needed revisions or something on scaffolding, you, as a supervisor, would call [USI] and get that done, correct?

A. I don't think I ever called [USI] to do a revision on a scaffold for me.

Q. But you could as a supervisor. Do you know one way or the other?

A. I could have.

Ignoring all this testimony, the Court cites instead to USI's and Valero's policies and to OSHA regulations and asserts that the evidence establishes that "USI was required to inspect the nearly three thousand scaffolds at the refinery before each work shift and before each scaffold's use." *Ante* at 467. Neither source is sufficiently specific, however, to support the Court's assertion. The OSHA regulations simply provide: "Scaffolds and scaffold components shall be inspected for visible defects by a competent person before each work shift, and after any occurrence which could affect a scaffold's structural integrity." OSHA Reg. 1926.451(f)(3). While the regulation does not expressly address whether its requirement applies to scaffolds that will not be used on a particular shift, Valero's policy, which adopts the OSHA regulation, confirms that Valero required USI to

inspect a scaffold only if an "affected employee" would be working on the scaffold during that shift: "Temporary Elevated Work Platforms shall be built, inspected, and used per OSHA standards, which include the following: ... CONTRACTORS shall ensure each scaffold is inspected prior to each work shift *before allowing AFFECTED EMPLOYEES to begin work.*" (Emphasis added).

This evidence establishes that USI was required to inspect a previously constructed scaffold only before shifts during which that scaffold would be used, and only if Valero contacted USI to let it know the scaffold would in fact be used. As the Court explains, it is undisputed that USI constructed the scaffold on which Levine was injured at least a week before the accident, and Valero did not contact USI to request any inspection or other work on the scaffold before Levine's accident. *Ante* at 476–77. As a result, consistent with the parties' contract and policies, USI had no obligation to inspect the scaffold before Levine used it, and in fact, USI's employees were not present at the refinery on the day of the accident or for the three prior days.

**2. Authority to inspect**

The Court also misstates the evidence when it asserts that "Valero place[d] upon USI ... the *sole* authority to authorize Valero employees to use scaffolds USI constructs." *Id.* at 476 (emphasis added). In fact, substantial evidence establishes that others, including some of Valero's employees, had authority to inspect a scaffold and update its inspection tag and thus authorize Valero's employees to use the scaffold.

As noted, the OSHA regulations require that scaffolds "be inspected for visible defects *by a competent person.*" OSHA Reg. 1926.451(f)(3) (emphasis added). And although Valero's policy provided that "CONTRACTORS shall ensure each scaffold is inspected prior to each work shift before allowing AFFECTED EMPLOYEES to begin work," the witnesses testified that Valero's carpenters who worked at the refinery were also "competent persons" under OSHA and they too could update an inspection tag. In fact, Valero carpenters had been in charge of updating the scaffolding for "years" before Valero hired USI.

Levine testified that when he got to the scaffold on the date of the accident—December 26, 2005—he checked the tag and confirmed that it had been inspected and updated that day:

> Q. So, how would you know whether or not the scaffolding had been inspected when you got on it ...?
>
> A. Because of the date of the yellow tag.
>
> Q. And what date was on the yellow tag?
>
> A. December 26, 2005.
>
> . . . .
>
> Q. And is it your testimony that nobody would have had to call for any type of inspection that day?
>
> A. No, because the yellow tag said that the scaffold was [inspected] December 26th. That's all you need.

When asked about Levine's testimony, Broussard (USI's site safety coordinator) initially asserted that Levine's testimony could not be correct because no USI employees were at the refinery that day:

> Q. But you can't tell me—you can't tell this jury that that scaffold wasn't updated that morning. Fair?
>
> A. We weren't there, man. We were not in that plant; so, we did not inspect it.

He then agreed, however, that Valero's carpenters were also "competent persons"

and they could have inspected the scaffold and updated the tag that day:

Q. Okay. It could have been inspected by someone else, right?

A. Yeah.

Q. You don't know if it was inspected by a Valero carpenter or not, do you?

A. No, I don't.

Q. Valero has competent people, don't they?

A. That's correct.

Q. They could have inspected it that morning, right?

A. They could have.

 . . . .

Q. Okay, sir. Mr. Levine testified the scaffold was updated, correct?

A. Yes.

Q. Okay. Do you have any evidence that that's wrong?

A. Other than the fact that no United Scaffolding people were—we have evidence that we were not in that plant. So, none of our people inspected it. So, yes, I can say we did not inspect it.

Q. I didn't ask if you inspected it, sir. Could someone else have inspected it?

A. Sure. A competent person.

In light of these facts, Broussard explained that, if Valero conducted the inspection and updated the tag, the scaffold belonged to Valero for that shift and only Valero was responsible for the scaffold:

Q. Other than United Scaffolding, who wasn't there, who else at Valero had competent people that could inspect the scaffold?

A. Valero.

Q. If Valero went to this scaffolding on the backside of the exchanger and inspected that scaffolding, whose scaffolding does that become?

A. Not ours because we didn't inspect it.

Q. Does that become a Valero scaffold?

A. The responsibility, yes.

Q. Have they accepted responsibility for that scaffold that they have ensured is now updated?

A. That's correct.

USI's own testimony thus establishes that USI did not have control of the scaffold when Levine was injured, and that Valero itself was authorized to inspect the scaffold and update the tag and thereby authorize its employees to use the scaffold. The Court misstates the record when it asserts that USI had "the sole authority to give Valero employees to access to scaffolds that USI has constructed." *Ante* at 476 n.4.

**3. Access to the scaffold**

The Court also misstates the evidence when it asserts that USI could access the scaffolds without Valero's permission and that Valero could not access them without USI's permission. According to the Court, Valero "mandate[d] requiring USI to authorize the use of a scaffold following a proper inspection." *Id.* at 478. And, the Court says, "No Valero employee was authorized to construct, use, or dismantle a scaffold without first securing USI's permission." *Id.* at 478. Evidence established, however, that Valero retained control over the scaffolds and that USI could only access the scaffolds if Valero requested and then permitted USI to access them.

Travis (USI's superintendent) explained that USI could access a scaffold at Valero's refinery only after receiving a work order from Valero and then getting a permit from Valero to go to the specific jobsite:

Q. You guys get an order from Valero who asks you that we need a scaffolding at a certain location?

A. Yes, sir.

Q. And then what happens next?

A. We get a work order from Valero.

Q. Okay.

A. And we go to the jobsite, get our permits. From that, go look at the jobsite, see what the safety requirements, especially in a[n] alky[10], is.

Broussard (USI's safety coordinator) explained that Valero issued the work orders and permits and USI was required to return them to Valero once USI finished the particular assignment:

Q. When somebody needs a scaffold erected, does [USI] create paperwork?

A. No, ma'am, not that I know of.

Q. Someone had mentioned a work order. You-all had work orders for scaffolds?

A. Yes. I think we had work—yeah, we had work orders.

Q. Is that a document that [USI] would keep once the scaffolding was done?

A. I believe Bob [Travis] said we keep them for a while, and then he would get rid of them. But I believe they had to be turned in, too. All that had to be turned back in.

Q. To who?

A. Valero.

Q. What about the permits for scaffolding? Was that something that you-all would keep?

A. No, ma'am.

Q. Why is that?

A. We have to turn them back in to operations so they can put them in a file.

Q. And operations, who is that?

A. Valero or—yeah, Valero.

And Levine testified that even Valero's own employees had to check in with Valero's "operations" office and have a "head operator" take them to a particular jobsite, especially an alkylation unit like the one he was working on when he was injured:

Q. When you get to the jobsite, what do you do, sir?

A. Over there that's a dangerous unit. Like I say, you have to be specially trained to work on the alkylation unit because that hydrochloric acid is nothing to play with. It will eat you all the way to the bone. You can see the smoke coming out. So, you have to check in with operations.

Q. After you check in with operations, what do you do?

A. You talk with the operators about the job. They explain what type of suit you have to wear to do the job with; and then once they explain that information and make sure you understand it, you have to do a walkthrough with operations on the unit. The head operator takes you out there on the jobsite. And you have to make sure everything is locked, tagged out, and ready to go. If it's not ready to go, you don't work.

In light of this testimony, the Court misstates the evidence when it asserts that USI retained control or a right to control a scaffold even if Valero did not send a work order, and that in the absence of a work

10. An "alky" unit is the area of the refinery where Levine was injured. Valero substantially restricted access to the alkylation units and required all workers in those units to have special qualifications and wear special protective gear because of the high risk of exposure to dangerous acid.

order, USI retained a right to control but "simply ... had no reason to exercise its right to control the scaffold at that time." *Ante* at 478. The record contains *no* evidence that USI had the right or the ability to access a scaffold at an alkylation unit without first receiving a work order and getting a permit. To the contrary, the evidence establishes that once USI finished constructing the scaffold at Valero's refinery, it had no right or obligation to access or inspect the scaffold unless Valero requested and permitted USI to do so.

### 4. Right to control at the time of the accident

Lastly, the Court misstates the evidence when it asserts that USI "retained control over the scaffold from construction through dismantling." *Id.* at 478–79. According to the evidence, USI had no right or obligation to inspect a previously constructed scaffold at the Valero plant unless Valero submitted a work order and granted a permit requiring or allowing USI to assert control over a particular scaffold. The evidence is undisputed that Valero did not submit a work order or grant a permit for USI to inspect the scaffold on which Levine was injured. Certainly, at least, the evidence does not *conclusively* establish that USI had control or a right to control the scaffold at the time of Levine's accident.

### D. The conclusion

Levine's petition asserted liability based on "negligence." It never alleged USI had control of or a right to control the scaffold at the time of the accident, and none of the alleged specific negligent acts necessarily required USI to have such control. The evidence establishes that USI did not have control of the scaffold at the time of the accident because Valero had not notified USI that it intended to use the scaffold and had not requested or authorized USI

to access or inspect the scaffold since USI finished building it at least a week before the accident. Because at least some evidence establishes that USI did not control or have a right or duty to control the scaffold when the accident occurred, the evidence does not conclusively establish the contrary. As a result, both the allegations and the evidence support the ordinary-negligence question the trial court submitted, and the question was not erroneous.

## II.

### Waiver and Invited Error

The great irony in this case is that the parties undeniably tried the case as an ordinary-negligence case—twice—and did so without any objection from either party. Levine's theory was that USI negligently constructed the scaffold by failing to nail a piece of plywood into place on the platform. In support of that theory, he got Broussard (USI's safety coordinator) to admit that the plywood "should have been nailed down" and that "there is no excuse for that plywood not to be nailed down." He then got Benoit (USI's supervisor) to admit that, even though he was the "competent person" in charge of the team that constructed the scaffold, he did not know at that time about USI's written policy requiring them "to nail down the plywood."

USI also tried the case as an ordinary-negligence case, without ever objecting to that liability theory. In defense of Levine's claim, USI argued it could not have been negligent because it was not present at the refinery on the day of the accident and it had no obligation to inspect the scaffold because Valero did not notify USI that it intended to use the scaffold and did not request an inspection. In its opening statement, USI asserted that if "Valero or a contractor needs a scaffold, they call

[USI], because [USI] would have no idea when they will need a scaffold. *They have to tell us.*" (Emphasis added). And in its closing argument, it urged the jury, "when you look at the jury charge and you get to that question about [USI] being negligent, what did we do? We weren't there. We couldn't inspect it. How are we negligent? How are we negligent for doing something that we couldn't do but for being absent?" Now, USI argues that Levine could only assert a premises-liability claim because USI actually controlled the scaffold at the time of the accident.

Regardless of the parties' shifting arguments, the important fact is that both parties tried the case, without any objection, as an ordinary-negligence case. At the first trial, USI itself proposed the ordinary-negligence question. After the trial court granted a new trial, the parties tried the case again. At the second trial, the court submitted the same jury charge with the same ordinary-negligence question USI had proposed at the first trial. Although the record does not reveal which party (if any) actually submitted or requested the same charge at the second trial, the record reflects (and USI agrees) that USI did not withdraw or object to the submission of the same ordinary-negligence question it had proposed at the first trial.

Levine argues that, even if his claim could sound only in premises liability, USI waived any complaint about the jury charge by failing to object to the submission of the ordinary-negligence question at trial. The Court recognizes that our rules require a defendant to object to a defective submission of a theory of recovery to preserve error, *see* Tex. R. Civ. P. 279, but holds that Rule 279 is irrelevant here because "the correct theory of recovery was omitted entirely." *Ante* at 481. I disagree. Although a premises-liability claim is independent from an ordinary-negligence

claim, it is still rooted in negligence principles. We have held, and the Court specifically notes, *see id.* at 635–36, that a plaintiff may submit a premises-liability claim by submitting a question on control and "a broad-form negligence question," as long as "instructions that incorporate the ... premises defect elements ... accompany the questions." *Olivo*, 952 S.W.2d at 529.

The jury charge here included a broad-form negligence question but lacked a question on control and instructions on the premises-liability elements. According to the Court's own rule, this is merely a defective submission, not a complete omission. *See ante* at 480 ("[T]his case was submitted to the jury under only a general-negligence theory of recovery, *without the elements of premises liability as instructions or definitions....*" (emphasis added)) (citing *Olivo*, 952 S.W.2d at 529 (holding jury charge that asked "a single simple negligence question" about defendant's employee "*omitted essential elements* of a premises defect claim") (emphasis added)). I agree with Levine that USI waived its complaint by failing to object to the omitted elements. *See* Tex. R. Civ. P. 279 (explaining when "omitted element or elements shall be deemed found by the court in such manner as to support the judgment").

Contrary to the Court's assertion, USI's burden to object to a defective charge is neither a "new rule" nor an affirmative defense. *Ante* at 470 n.1. Parties have had the guidance of Rule 279 since 1940. And no evidentiary burden (as would be required of an affirmative defense) underlies the *procedural* preservation burden Rule 279 imposes. *See, e.g., Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 229 (Tex. 2011) (noting elements deemed found under Rule 279 must still be supported by sufficient evidence).

And even if USI had not waived its complaint by failing to object, I agree with Levine that USI invited the trial court to err by proposing the ordinary-negligence question. Since the record reflects that the court in the second trial simply used the same question USI had proposed in the first trial, and it does not reflect that USI ever withdrew the question it had proposed in the very same case, USI invited the error of which it now complains. "Parties may not invite error by requesting an issue and then objecting to its submission." *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) (holding that defendant invited error when it "requested the very issues that it now seeks to avoid"); *see Del Lago*, 307 S.W.3d at 776 ("The error in not allowing Smith to pursue a separate negligent-activity claim, if any, occurred at Del Lago's behest.").

### III.

### Conclusion

The Court misstates the standard of review, the pleadings, and the evidence. Levine asserted an ordinary-negligence claim and pleaded facts supporting that claim. At least some evidence established that USI did not have control of the scaffold at the time of Levine's accident, and the evidence certainly did not conclusively establish that USI had such control. Because the allegations and evidence do not conclusively establish that USI had control of the premises at the time of the accident, I cannot say that, as a matter of law, the ordinary-negligence question was erroneous. Under Texas law, the proper claim against a contractor who negligently creates a dangerous condition on another's land and then relinquishes control of the premises before any injury occurs is a claim for ordinary

11. USI raises a second issue on appeal, asking whether a trial court's order granting a new trial is reviewable on appeal after the

negligence. And even if all of that were incorrect, USI invited the alleged error and waived its complaint. I would hold that Levine is entitled to recover on the jury's finding that USI negligently caused Levin's injuries.[11] Because the Court does not, I respectfully dissent.

new trial. I would proceed to answer that question, which the Court does not reach.